GRIFFIS, P.J., for the Court:
¶ 1. Hazel Gwendolyn Johnson was granted a divorce from Willie C. Johnson on the ground of habitual cruel and inhuman treatment. The chancellor divided the marital property and awarded Hazel $900 per month in permanent alimony and $3,000 in attorney’s fees. Willie argues: (1) Hazel failed to prove habitual cruel and inhuman treatment, and (2) the chancellor’s finding that alimony was appropriate was manifestly wrong. We find no reversible error and affirm the chancellor’s judgment.
FACTS
¶ 2. Hazel and Willie were married in 1982. Their daughter, Deirdre Johnson, was born in 1987. They finally separated in 2003, and the chancellor’s judgment of divorce was entered on January 28, 2010.
¶ 3. Willie, who is sixty-three years old, has a Ph.D. He was a professor at Utica Junior College from the time he and Hazel married until 1992. He then took a job as an administrator with the Jackson Public Schools, where he remains employed. He also occasionally serves as an adjunct professor at Jackson State University. The chancellor found that Willie’s net monthly income is $5,589.30; he has $62,260 in a 403(b) retirement account; and his PERS account would pay him $3,299 per month should he retire.
¶ 4. Hazel, who is fifty-eight years old, has a masters degree. She has worked in some capacity at Hinds Community College from the time she and Willie were married until 1996, when she retired. She came out of retirement in 2003 and took a position at Jackson State University, where her net monthly pay was $1,921.30. Her position was contingent on the school receiving grant funds, and the latest grant *784 ended in September 2009, which left her unemployed at the time the chancellor entered her judgment. The chancellor found that Hazel has $9,871.59 in a 408(b) retirement account, and her PERS account would pay her $2,033.90 per month should she retire again.
¶ 5. Hazel suffers from many health problems, including diabetes, COPD, and a heart murmur. She also has problems with her eyes. She wears a prosthetic eye in her right socket.
¶ 6. The evidence established that Willie had affairs with two of his students at Utica Junior College — Carrie Jones and Mary Payne — in the early 1990s. There was some evidence that Jones and Willie conceived a daughter, Amber Crawford, who was born in 1992. Hazel testified that Willie had told her that to the best of his knowledge, Crawford is his child, but it was unclear when he allegedly made that statement. Also, an e-mail that Jones had sent to Willie was admitted into evidence. In the e-mail, dated in 2001, Jones claims that Crawford is Willie’s child, which Willie denied.
¶ 7. It was undisputed that Willie and Payne conceived a daughter, Olivia Johnson, who was also born in 1992. The record contains the results of a DNA test, dated April 2004, that shows Willie could not be excluded as the father. In addition, the evidence included documents from Claiborne County Chancery Court which indicate that in June 2004, Willie was ordered to pay child support to Payne for the care of Olivia.
¶ 8. Hazel testified that while Willie was still teaching at Utica Junior College, she had some knowledge of Willie’s affairs, but she did not know about the illegitimate children. She also testified that she thought the affairs had ended by the time the family moved to Jackson in approximately 1992. She stated that she trusted her husband, in spite of his indiscretions, so she decided to continue in the marriage.
¶ 9. The evidence was not clear exactly when Hazel learned that Willie had fathered the two illegitimate children. Hazel testified that she might have first learned about Olivia in 2004 when the results of the DNA test arrived in the mail at her home. In contrast, Willie testified that Hazel knew about Olivia as early as 2001 when she found a letter from Payne to Willie on Willie’s desk. There was no testimony about when Hazel had learned that Crawford might be Willie’s child.
¶ 10. According to Hazel, Willie informed her in 2001 that he had resumed his affair with Jones. Around that time, Jones began a campaign of bizarre and threatening behavior directed toward Hazel. Jones made repeated, harassing phone calls to Hazel. Hazel testified that she logged ninety-six calls in one day.
¶ 11. Hazel testified that in one incident, Jones went into Hazel and Willie’s garage late at night. Using an orange security cone she had retrieved from the street, she hammered on Hazel’s car. Photographs of Hazel’s car were admitted into evidence, which show what appears to be minor, superficial damage to the car’s trunk and rear windshield. The record also contains an estimate that estimated the cost of repair to be $1,745.58.
¶ 12. In another incident, according to Hazel, Jones obtained photographs of Hazel and Willie’s wedding from Willie’s office. She wrote “broken promises” on them and threw them on the street in front of Hazel and Willie’s house. The record contains what appears to be a printout from a computer that shows a copy of a wedding photograph with “Broken Promises” typewritten above it.
¶ 13. Hazel testified that as a result of Jones’s behavior, she felt terrified, and she *785 would often stay inside her home with the garage door down.
¶ 14. Hazel testified that Willie promised to end his relationship with Jones, so she decided to continue in the marriage. Willie did not keep his promise. Hazel testified that sometime in 2002, when Willie did not arrive at home on time, she drove by Jones’s residence and saw Willie’s car there. It is undisputed that Willie and Jones were romantically involved at that time.
¶ 15. In spite of this discovery, Hazel continued in the marriage. She wanted to work things out. Instead, it was Willie who decided to leave. Willie moved out of the marital home in October 2003. Willie testified that he then moved in with his sister, but documents were introduced into evidence that show he had his mail sent to Jones’s address.
¶ 16. Hazel testified that in May 2004, Willie physically assaulted her in her home — the former marital home. He pushed her up against the washing machine, dryer, and the walls. She went to the hospital. Hospital records were admitted into evidence. They show that she presented to the hospital with minor bruises above her right eye and along the bridge of her nose and minor lacerations on the inside of her mouth. The severity of her wounds was described as “mild.” She was released with instructions to use a warm compress and rest. Willie denied that he had ever assaulted Hazel.
¶ 17. In 2008, Jones had a son named Austin Johnson. Willie is listed as the father on Austin’s birth certificate. Willie testified that Austin might be his child.
¶ 18. Hazel filed a complaint for divorce. By order dated January 28, 2010, the chancellor granted Hazel a divorce on the ground of habitual cruel and inhuman treatment, divided the marital property, awarded her $900 per month in permanent alimony, and awarded her $3,000 in attorney’s fees.
STANDARD OF REVIEW
¶ 19. This Court will not disturb the findings of a chancellor when supported by substantial, credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Sanderson v. Sanderson, 824 So.2d 623, 625-26 (¶ 8) (Miss.2002). Legal questions are reviewed de novo. Russell v. Performance Toyota, Inc., 826 So.2d 719, 721 (¶ 5) (Miss.2002).
ANALYSIS

1. Habitual Cruel and Inhuman Treatment

¶ 20. Willie argues that the chancellor’s finding of habitual cruel and inhuman treatment was manifestly wrong. He contends that the only support for the chancellor’s finding was his adultery. He argues adultery is a separate and distinct ground for divorce and is not, by itself, enough to support a finding of habitual cruel and inhuman treatment. He also argues that Hazel had condoned his adultery.
¶ 21. Before we address those arguments, we must first dispose of a minor issue. In the chancellor’s judgment, when she discusses the facts that support a finding of habitual cruel and inhuman treatment, she states that Willie had transmitted a venereal disease to Hazel. On appeal, Willie complains that there was no evidence to support such a finding. After a thorough review of the record, we conclude that Willie is correct. The first time any mention is made of a sexually transmitted disease is in the chancellor’s judgment. There is no testimony or other *786 evidence in the record to support the chancellor’s finding that Willie transmitted a venereal disease to Hazel.
¶ 22. Nevertheless, this Court may affirm a chancellor’s judgment for reasons different than those cited by the chancellor. Mason v. S. Mortg. Co., 828 So.2d 735, 738 (¶ 15) (Miss.2002) (citation omitted). Because we find there is substantial evidence in the record to support a finding of habitual cruel and inhuman treatment, the chancellor’s mistake is harmless error.
¶ 23. We now turn to the arguments outlined above. To establish habitual cruel and inhuman treatment, the petitioner must show, by a preponderance of the evidence that: (1) the other spouse’s conduct was cruel and inhuman, and (2) the petitioner’s physical or mental health was negatively impacted by that conduct. Fisher v. Fisher, 771 So.2d 364, 367 (¶ 10) (Miss.2000); see also Bias v. Bias, 493 So.2d 342, 345 (Miss.1986). Conduct is cruel and inhuman if it “either endangers life, limb[,] or health, or creates a reasonable apprehension of such danger ... or ... [is] so unnatural and infamous as to make the marriage revolting to the [other] spouse[.]” Fisher, 771 So.2d at 367 (¶ 9).
¶ 24. While Willie might be correct that adultery alone cannot support a finding of habitual cruel and inhuman treatment, a pattern of adultery, when combined with other cruel and inhuman conduct, can support such a finding. Id. at 368 (¶¶ 12-13). In Fisher, the Mississippi Supreme Court held that the husband’s several acts of adultery and few acts of physical violence supported a finding of habitual cruel and inhuman treatment. Id.
¶ 25. Likewise, in this case, there was substantial evidence that Willie had committed several acts of adultery and that he had, on at least one occasion, committed an act of physical violence. Willie fathered at least two — possibly three — children out of wedlock with two different women during his marriage to Hazel. His affair with Jones spanned almost two decades — beginning in approximately 1991 at Utica Junior College and continuing up until the entry of divorce in 2010. Also, Hazel’s testimony and the hospital records indicate Willie physically assaulted her in their former marital home in May 2004. We find these facts are sufficient to establish that Willie’s conduct was cruel and inhuman.
¶ 26. We also find Hazel has shown the requisite impact on her physical or mental health. The hospital records indicate that she suffered bruises and lacerations following the incident in May 2004. Also, Willie’s affair with Jones caused significant stress for Hazel. Jones became possessive, jealous, and threatening. She made harassing phone calls to Hazel, damaged property in Hazel’s garage, and scattered Hazel’s wedding photographs on the street in front of Hazel’s house. Hazel testified that as a result of that behavior, she felt terrified and would often barricade herself inside her home.
¶ 27. Lastly, we do not find Hazel had condoned Willie’s adultery. Hazel did continue in the marriage after she learned about Willie’s affairs, but the evidence indicates she expected him to end the affairs and recommit to the marriage. She forgave him for his past indiscretions, but she did not consent to live in a marriage with a habitually unfaithful husband. This is not a case where isolated acts of adultery were forgiven by the other spouse. Rather, Willie’s adultery was habitual and continuous.
¶ 28. In Smith v. Smith, 40 So.2d 156, 157 (Miss.1949), the supreme court rejected the husband’s argument that his wife had condoned his habitual cruel and inhuman treatment by continuing in the marriage. The court distinguished a “single *787 act” from “courses of conduct,” suggesting that it is more difficult to establish condo-nation of the latter. Id. The supreme court stated: “The effort to endure unkind treatment as long as possible is commendable and the patient endurance by the wife of her husband’s ill-treatment should not be allowed to weaken her right to a divorce.” Id. Likewise, in Lindsey v. Lindsey, 818 So.2d 1191, 1195 (¶¶ 17-18) (Miss. 2002), the supreme court found the doctrine of condonation inapplicable under the facts of the case. The husband had forgiven his wife for her past acts of adultery, but the wife proceeded to commit adultery again. “Condonation can be avoided if ... the marital offense is repeated.” Id. Based on these authorities, we find Hazel had not condoned Willie’s habitual adultery.
¶ 29. For these reasons, we find no reversible error in the chancellor’s determination that Hazel was entitled to a divorce on the ground of habitual cruel and inhuman treatment. This issue has no merit.

2. Alimony

¶ 30. Next, Willie argues that the chancellor was manifestly wrong when she decided that alimony was appropriate. We note Willie does not argue that the actual amount of alimony awarded was excessive or oppressive.
¶ 31. When deciding whether alimony should be awarded, chancellors must consider the Armstrong factors. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993). If the chancellor applies the correct legal standard, this Court cannot reverse the chancellor’s judgment unless it is manifestly wrong. Id. (citation omitted).
¶ 32. Here, after dividing the marital property, the chancellor conducted the proper analysis to determine whether alimony was appropriate. Her judgment listed each Armstrong factor and made thorough findings of fact under each factor.
¶33. On appeal, Willie contests some of those findings. He restates his objections about marital fault and the venereal disease. Because we addressed those issues above, we will not address them again here. He also takes issue with the chancellor’s finding that he had dissipated marital assets by spending money on his girlfriends and his children born out of wedlock with two different women. He seems to argue that there was no substantial evidence to support that finding.
¶ 34. Even if we subtract dissipation of marital assets from the chancellor’s analysis, substantial support remains for the award of alimony. The chancellor highlighted four facts: (a) Willie has a substantial income and significant retirement savings, while Hazel is unemployed and has little saved for retirement; (b) Willie is in good health, while Hazel is plagued by numerous health problems; (c) Willie and Hazel were married for twenty-seven years; and (d) Willie’s fault caused the dissolution of the marriage.
¶ 35. We have little trouble in concluding that the chancellor’s determination and award of alimony was not erroneous. This issue is without merit.

3. Attorney’s Fees

¶ 36. Lastly, in her brief, Hazel asks this Court to award her attorney’s fees on appeal in the amount of one-half the attorney’s fees that she was awarded by the chancellor. The chancellor awarded her $3,000. She asks this Court to award her an additional $1,500 in attor- *788 ne/s fees.[1]
¶ 37. The chancellor determined that because Hazel was unemployed and lacked substantial liquid assets, she would be unable to pay her attorne/s fees. The chancellor then conducted an analysis under Mississippi Rule of Professional Conduct 1.5(a) and McKee v. McKee, 418 So.2d 764, 767 (Miss.1982) in order to determine a reasonable fee for Hazel’s attorney. The chancellor decided that $3,000 was a reasonable fee. The chancellor then ordered Willie to pay that amount to Hazel.
¶ 38. “This Court has generally awarded attorne/s fees on appeal in the amount of one-half of what was awarded in the lower court.” Stewart v. Stewart, 2 So.3d 770, 776 (¶ 20) (Miss.Ct.App.2009) (citation omitted). Because we agree with the chancellor’s finding that Hazel’s financial condition made her unable to compensate her attorney, we award Hazel an additional $1,500 in attorney’s fees on appeal.
¶ 39. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. THE APPELLANT IS ORDERED TO PAY $1,500 IN ATTORNEY’S FEES ON APPEAL TO THE APPELLEE. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT. MYERS, J., NOT PARTICIPATING.

. In the alternative, Hazel asks this Court to award her damages under Mississippi Code Annotated section 11-3-23 (Rev.2002). That statute has been repealed, effective January 1, 2003. Miss.Code Ann. § 11-3-23 (Supp. 2011).